United States District Court
Southern District of Texas
**ENTERED**
November 01, 2021
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **BRONSON MCCLELLAND,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:21-CV-00520** |
| | § | |
| **KATY INDEPENDENT SCHOOL** | § | |
| **DISTRICT**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM & ORDER

Pending before the Court are (1) Defendants' Motion to Dismiss all claims, (2) Plaintiff's Motion to Strike Defendants' affirmative defense that Plaintiff released all claims accruing before September 29, 2020, by signing a contested settlement agreement; (3) six Motions to Quash deposition notices served by the plaintiff against individual Defendants and witnesses who are, or may be, under criminal investigation; and (4) Plaintiff's Motion to Unseal.

The Court held a hearing on October 20, 2021, on the motions then pending. It took those motions under advisement, after which the Parties filed supplemental briefing and an additional motion.

For the reasons set forth below, the Court now **GRANTS** the Motion to Dismiss, **DENIES AS MOOT** the Motion to Strike and Motions to Quash, and **DENIES** the Motion to Unseal.

### I.    BACKGROUND

### A.  Factual Background

Plaintiff Bronson McClelland is a former student of Katy High School. He was the starting quarterback and team captain of the school's high-performing football team.

### 1. *Snapchat Incident*

On October 3, 2019, the Katy High School football team narrowly defeated rival Tompkins High School. After the game, students from both schools went to a local Whataburger, where students from Tompkins High were allegedly taunting Katy High students. Plaintiff and several teammates arrived at the scene. During this off-campus altercation, Plaintiff sent a Snapchat[1] video from his friend's phone to Jose Hernandez, a Tompkins High student who was not a member of the football team. In this video, Mr. McClelland stated: "[We'll] put your motherf*cking ass in the hospital, n*gga'. What the f*ck."

Mr. Hernandez recorded[2] the video and sent it to several of his friends, including Tunmise Adeleye, an African American Tompkins High football player. Mr. Adeleye uploaded the video to his personal Twitter page, which Plaintiff states "g[ave] the illusion or appearance that McClelland sent the video to Adeleye." Plaintiff's Second Amended Complaint, Doc. 37 ¶ 17.

On October 4, 2019, Defendant Gary Joseph, the coach of the football team, called Plaintiff's father to discuss the video, which was rapidly circulating and garnered substantial media attention. Plaintiff and his parents met with Coach Joseph and Katy High School Principal Rick Hull, and the school officials stated that Plaintiff would be disciplined for his involvement in the Snapchat incident. Specifically, he would be suspended for the following two games and would be stripped of his position as captain of the team.

Plaintiff then released a public apology regarding his social media conduct in which he noted the discipline imposed on him. Defendants Hull and Joseph allegedly contacted Plaintiff's

---

[1] Snapchat is a social media application that allows users to share images and videos meant to disappear after recipients have viewed them.

[2] It appears Mr. Hernandez screen-recorded the video outside of the Snapchat application. Screen-recording allows the recipient of a Snapchat message or video, which would otherwise be ephemeral, to keep a copy of the media.

father demanding that Plaintiff remove or amend his apology, lest it appear that that Hull and Katy High School "rushed the investigation." *Id.* ¶ 23. Plaintiff refused. Defendant Katy Independent School District ("Katy ISD") thereafter released its own statement:

> *On the evening of Thursday, October 3, 2019 . . . a KHS student-athlete posted a video of himself on social media in which he used racially charged language to taunt a student-athlete on the opposing team. Campus administration, Katy ISD police and local law enforcement thoroughly investigated the video incident. The student responsible will face disciplinary consequences in according with the Katy ISD Discipline Management Student Code of Conduct and Athletic Code of Conduct. However, it is important to note there are other related incidents that continue to be under investigation that would lead to additional consequences for any student found to be involved . . . .*

Defendants' Motion to Dismiss, Doc. 43, at 4-5. Plaintiff alleges that Katy ISD, through Hull and Katy ISD Deputy Superintendent Haack, knew that Mr. McClelland had not sent the video to "a student-athlete on the opposing team," but rather to a non-African American student who was not on the Tompkins High football team. Nonetheless, Plaintiff alleges, Katy ISD knowingly "promoted the false-narrative that Plaintiff was a racist and notified the media and general public that Plaintiff would be punished for his off-campus speech." Plaintiff's Second Amended Complaint, Doc. 37 ¶ 26.

Plaintiff further states that, after this series of events, Coach Joseph held a team meeting where he discussed the discipline imposed on Plaintiff, noted that he had regularly tolerated the use of the N-word at practices and in the weight room (without disciplining any other students), and announced a new rule prohibiting future use of the N-word at on-campus and school-related events under his supervision.

Plaintiff further alleges that Katy ISD refused to amend its statement even after confirmation that the video was in fact sent to Mr. Hernandez, despite Mr. McClelland and his family's concern that any public impression that he directed the video toward a Black student would negatively impact his academic and athletic prospects. Plaintiff alleges that several large

universities informed him that he was not recruitable until Katy ISD's statements were rescinded or corrected. After Mr. McClelland exhausted the administrative process to seek resolution of the alleged false statement, he and Katy ISD ultimately agreed that Katy ISD would have until September 18, 2020, to resolve the matter before Plaintiff would pursue legal remedies.

### 2. *Marijuana Incident*

On the eve of this deadline, September 17, a Katy ISD police canine unit identified Plaintiff's car in an allegedly random search while it was parked in Katy High's parking lot. Police officer Stephanie Fulgencio found 0.04 grams of a "green leafy substance" on the back floor mat of the vehicle. She later noted in her official report that this was not a "useable amount." When Plaintiff was summoned to his car, he denied ownership, possession, and knowledge of the presence or nature of the substance. (At the time, Mr. McClelland shared the vehicle with his older brother, who later admitted during Plaintiff's disciplinary proceedings that the substance belonged to him.) Defendants charged Plaintiff with possession of marijuana, suspended him for three days, and sent him to a Disciplinary Alternative Education Program ("DAEP") under Tex. Educ. Code §37.006(a)(2)(C)(i).

Section §37.006(a)(2)(C)(i) provides that "[a] student shall be removed from class and placed in a disciplinary alternative education program as provided by Section 37.008 if the student . . . sells, gives, or delivers to another person or possesses or uses or is under the influence of . . . marihuana or a controlled substance, as defined by Chapter 481, Health and Safety Code, or by 21 U.S.C. Section 801 *et seq*." As Plaintiff emphasizes, Tex. Health & Safety Code §481.121(a) provides that "a person commits an offense if the person knowingly or intentionally possesses a usable quantity of marihuana" (emphasis added). Further, Texas law exempts "hemp" from its definition of "marihuana," meaning that cannabis with a 0.3% concentration or less of

tetrahydrocannabinol ("THC") may be lawfully possessed. *See* TEX. HEALTH & SAFETY CODE §443.201; TEX. AGRICULTURE CODE §121.001.

At a disciplinary hearing the following day, Officer Fulgencio allegedly informed Principal Hull that she located an "unusable amount" of the substance. She allegedly also stated that a substance must have a THC level above 0.3% to be considered unlawful marijuana, so the substance had to be tested as to its THC potency. Plaintiff alleges that Principal Hull, disregarding the "usable quantity" requirement of TEX. HEALTH & SAFETY CODE §481.121(a) and without knowing the concentration of THC in the substance, determined that Plaintiff was in possession of marijuana and initiated the process to transfer him to the DAEP.

On September 21, three days later, at Defendant Hull's request, Officer Fulgencio conducted a presumptive field test on the substance; Plaintiff alleges that this test can only determine the existence of THC, but not its potency. Officer Fulgencio and her supervisor, Assistant Chief Kevin Tabor, prepared a supplemental police report concluding that the substance had a "presence of THC, this was in fact marijuana." That day, Plaintiff was sent to the DAEP for 45 days.

Plaintiff challenged his DAEP placement. He also decided that he wanted to leave Katy ISD. The parties agreed to resolve the disciplinary dispute, and, on September 29, 2020, the parties signed a settlement agreement. The settlement agreement provided for the abatement of the disciplinary process. It further stated that Katy ISD, "[i]f asked about discipline by another education institution out of the State of Texas . . . will refer them to [a] letter [on the status of the discipline] and indicate that no discipline consequences remain." Settlement Agreement, Doc. 37-4, at 4. The following provisions are also relevant here:

- Sec. II(A), which provides for a complete and general release of claims by Plaintiff's family;

- Sec. II(B), the family's covenant not to sue, which "shall not be binding upon the Family if Bronson McClelland is not admitted to a transfer school or isn't cleared by California regulations for that school to participate in varsity sports due to the allegations from September 17, 2020"; and

- Section IV(A)(3), which states: "Family understands that the discipline is being abated; however, if Bronson McClelland re-enrolls at Katy ISD in the future, that abatement will be null and void and the student will be required to finish the assigned time in the discipline alternative campus (DAEP). Should this happen, the Family would still be permitted to a hearing in front of a District Level Committee as defined by the Student Discipline Management plan. This is the same hearing process that was scheduled for September 29, 2020."

Settlement Agreement, Doc. 37-4, at 2, 4.

Mr. McClelland unsuccessfully attempted to transfer to a school in California, allegedly "as a result of Katy ISD providing erroneous transcripts to the receiving school." Doc. 37 ¶ 52. He then enrolled at Manor Senior High School in Manor, Texas. While at Manor High, he sought to have his eligibility to play varsity sports reinstated, which required that Katy High School complete the University Interscholastic League ("UIL") Previous Athletic Participation Form. On that form, as required by the Settlement Agreement, Coach Joseph indicated no disciplinary issues or any reason McClelland could not participate.

On October 29, 2020, having been denied eligibility by UIL to participate in athletics at Manor High School due to residency requirements, Plaintiff re-enrolled at Katy High School. His

discipline was reinstated; he was placed into the DAEP, which prevented him from returning to Katy High School or its football team. Plaintiff graduated from Katy ISD in December 2020 and is now in community college.

### B. Procedural History

This case was removed from Fort Bend County, TX, on February 17, 2021. The Second Amended Complaint, the one at issue here, was filed in July 2020. It states claims under the First Amendment, the Fourteenth Amendment, and 42 U.S.C. § 1983. Plaintiff also brings various state law claims, seeking damages and injunctive relief for defamation; a declaration that Katy ISD cannot now claim that Plaintiff committed the offense of possession of marijuana because it previously (allegedly) took the position that Plaintiff did not commit the offense; a declaration that certain individual defendants acted *ultra vires*; and damages for conspiracy.

Defendants have filed a Motion to Dismiss and several Motions to Quash Deposition Notices of individual Defendants and witnesses who are, or may be, under criminal investigation.[3] Plaintiff, on the other hand, filed a Motion to Strike Defendants' Affirmative Defense that Plaintiff, by signing the Settlement Agreement, released all claims accruing before September 29, 2020. Finally, Plaintiff filed a Motion to Unseal the Motions to Quash that Defendants filed under seal. The Court addresses each of these motions below.

## II. MOTION TO DISMISS

Defendants move to dismiss all of Plaintiff's claims under 12(b)(6). They also seek dismissal of some claims on jurisdictional grounds under 12(b)(1).

---

[3] Plaintiff's family approached the Fort Bend District Attorney's Office about potential criminal charges against several of the Defendants and/or witnesses named in this lawsuit.

## A. Legal Standard

### 1. 12(b)(6)

Rule 12(b)(6) provides for dismissal of a cause of action based on the plaintiff's failure to state a claim upon which relief could be granted. FED. R. CIV. P. 12(b)(6). The burden is on the movant to show that the plaintiff has failed to state a legally cognizable claim. *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, No. CV H-16-114, 2017 WL 2266993, at *3 (S.D. Tex. Apr. 24, 2017), *report and recommendation adopted*, No. 4:16-CV-114, 2017 WL 2271491 (S.D. Tex. May 22, 2017). "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

"Under Rule 12(b)(6), a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief." *Lane v. Halliburton,* 529 F.3d 548, 557 (5th Cir. 2008). All well-pleaded facts will be taken as true and viewed in the light most favorable to the plaintiff. *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). But any allegations in the complaint which are conclusory will not be afforded a presumption of truth. *Johnson v. E. Baton Rouge Fed'n of Teachers*, 706 F. App'x 169, 170 (5th Cir. 2017) (per curiam). Therefore, a complaint must contain sufficient factual matter that states a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Legal conclusions that are "naked assertions devoid of further factual enhancement" or mere "formulaic recitation of [a claim's] elements" are not enough. *Id.* Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turner v.*

*Lieutenant Driver*, 848 F.3d 678, 684-685 (5th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).

### 2.   12(b)(1)

A party may move for a court to dismiss a plaintiff's cause of action on the basis that the court lacks subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). Unlike motions to dismiss under Rule 12(b)(6), where the plaintiff's allegations are taken as true and viewed under the most favorable light, the plaintiff bears the burden of proof that jurisdiction exists under Rule 12(b)(1). *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."). Courts must consider a jurisdictional attack under Rule 12(b)(1) prior to considering other grounds for dismissal. *Ramming*, 281 F.3d at 161 (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.")). In considering whether it has subject matter jurisdiction, a court may consider matters of fact that are either in dispute or outside the pleadings. *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986); *Ambraco Inc. v. Bossclip B V*, 570 F.3d 233, 238 (5th Cir. 2009) (noting that both 12(b)(1) and (b)(3) allow courts to look past the pleadings to resolve disputed facts). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his

claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).

### B. Discussion

#### 1. First Amendment—Off-Campus Speech

Defendants seek to dismiss Plaintiff's claim that Katy ISD's disciplinary action against him for his off-campus speech violated his rights under the First Amendment. The Court begins by discussing the applicable caselaw.

In 1969, the Supreme Court famously declared that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969). Still, while the First Amendment's protections apply to the school environment, "those rights must be tempered in the light of a school official's duty to, *inter alia*, 'teach[ ] students the boundaries of socially appropriate behavior' and 'protect those entrusted to their care.'" *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 389-90 (5th Cir. 2015) (first quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986); then quoting *Morse v. Frederick*, 551 U.S. 393, 408 (2007)). When determining the contours of a student's free speech rights, the Court must keep in mind the "special characteristics of the school environment," acknowledging that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Morse*, 551 U.S. at 396–97 (quoting *Fraser*, 478 U.S. at 682)).

The Supreme Court first addressed the limits of school discipline of student expression in *Tinker*. In evaluating the constitutionality of the school district's suspension of students for wearing black armbands to protest the Vietnam War, the Court balanced the need to maintain school order and promote a safe learning environment against the students' right to express their opinions. 393 U.S. at 740–41. The Court held that the students' speech, which neither "interrupted school activities nor . . . intrude[d] in the school affairs or the lives of others," was protected by the First Amendment. *Id.* at 740. Only where a student's speech actually causes or reasonably might be projected to cause a "substantial disruption of or material interference with school activities" may a school impose discipline for student speech. *Id.*; *see also Bell*, 799 F.3d at 390 (observing that the *Tinker* standard may be satisfied "either by showing a disruption has occurred, or by showing 'demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption" (emphasis omitted) (quoting *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 974 (5th Cir. 1972))).

Since *Tinker*, the Supreme Court has considered the reach of the First Amendment in schools on three occasions. In each of these cases, it articulated a "narrow exception[ ] to the general *Tinker* standard based on certain characteristics, or content, of the speech." *Bell*, 799 F.3d at 390. First, in *Fraser*, the Supreme Court held that a school was constitutionally permitted to discipline a student for utilizing vulgar and offensive terms and sexual innuendo during an on-campus event. *Fraser*, 478 U.S. at 683. The Court noted that the student's speech took place during an "official high school assembly attended by 600 students," and held that it was an appropriate function of a school to "prohibit the use of vulgar and offensive terms in public discourse." *Id.* at 681; *see also id.* at 683 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."). Next, in

*Hazelwood v. Kuhlmeier*, the Supreme Court upheld the right of a school district to "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273 (1988). And finally, in *Morse v. Frederick*, the Supreme Court held that a school official may suppress speech conducted during a school-sponsored event that "promote[s] illegal drug use." 551 U.S. 393, 410 (2007).

Each of these cases represents an exception to the substantial-disturbance test articulated in *Tinker*. In affirming the schools' right to discipline the speech at issue in those cases, the Supreme Court did not require the school officials to forecast a substantial disruption to the classroom environment or other school activities. Instead, the Court held that the district could discipline the students because of the "special features of the school environment" and the particularly harmful aspects of the speech at issue in each case. *Bell*, 799 F.3d at 392 (quoting *Morse*, 551 U.S. at 425, 127 S.Ct. 2618 (Alito, J., concurring)).

Recognizing that *Fraser*, *Hazelwood*, and *Morse* exemplify three narrow exceptions to the *Tinker* standard, the Fifth Circuit held in *Bell* that "threats against, and harassment and intimidation of, teachers" must be analyzed under the *Tinker* rule. 799 F.3d at 392.8 In *Bell*, a high school student posted a rap recording to his personal Facebook page, and later to YouTube, while he was "[a]way from school or a school function and without using school resources." *Id.* at 383. The recording contained threatening, profane, and intimidating language directed towards two teachers, accusing them of sexually harassing students at the high school. *Id.* at 384. When the school became aware of the recording, the student was suspended. *Id.* at 385. On appeal, the Fifth Circuit upheld the district's disciplinary actions. *Id.* at 394. Though the student's speech was conducted off-campus, it was "intentionally direct[ed] at the school community," and the

speech could reasonably be understood "by school officials to threaten, harass, and intimidate a teacher." *Id.* at 396. These unique features of the speech in *Bell* allowed the school to reasonably forecast "a substantial disruption," justifying school discipline. *Id.* at 398.

"*Bell*, however, did not articulate a generally-applicable standard for the discipline of all off-campus speech." *Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 267 (5th Cir. 2019). The Fifth Circuit noted in *Bell* that it was declining to adopt a "specific rule" that would apply to all circumstances under which off-campus speech may be restricted. *Id.* at 394. Instead, the Fifth Circuit limited itself to the facts of that case, observing only that "*Bell*'s admittedly intentionally directing at the school community his rap recording containing threats to, and harassment and intimidation of, two teachers permits *Tinker*'s application in this instance." *Id.* In synthesizing the school speech law above, the Fifth Circuit wrote:

> *First, nothing in our precedent allows a school to discipline non-threatening off-campus speech simply because an administrator considers it "offensive, harassing, or disruptive."* Bell, *799 F.3d at 402 (Elrod and Jones, JJ., concurring);* see also id. *(observing that "the First Amendment does not, for example, allow a public school to punish a student for 'writ[ing] a blog entry defending gay marriage' from his home computer, even if the blog entry causes a substantial disruption at the school" (citing* Snyder, *650 F.3d at 939 (Smith, J., concurring))). Second, it is "indisputable" that non-threatening student expression is entitled to First Amendment protection, even though the extent of that protection may be "diminished" if the speech is "composed by a student on-campus, or purposefully brought onto a school campus."* Porter, *393 F.3d at 618–19. And finally, as a general rule, speech that the speaker does not intend to reach the school community remains outside the reach of school officials. See id. at 615 (holding that a student drawing that was "completed in [the student's] home, stored for two years, and never intended by him to be brought to campus" does not "constitute[ ] student speech on the school premises"); see also Bell, 799 F.3d at 395. Because a school's authority to discipline student speech derives from the unique needs and goals of the school setting, a student must direct her speech towards the school community in order to trigger school-based discipline. We acknowledge, however, that the "pervasive and omnipresent nature of the Internet" raises difficult questions about what it means for a student using social media to direct her speech towards the school community.* Id. . . . *We recognize that the articulation of these rules still leaves many questions unanswered, and a more defined rule will be left for another day.* Bell, *799 F.3d at 403. Given these principles, however,*

> *we hope to give some guidance to schools for the future, with the important reminder that "a broad swath of off-campus student expression" remains fully-protected by the First Amendment. Id. at 402 (Elrod and Jones, JJ., concurring).*

*Longoria*, 942 F.3d at 267–69.

More recently, the Supreme Court has indicated that the *Tinker* standard continues to apply and that certain circumstances may preclude First Amendment protection of even off-campus speech. *Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038 (2021). In *Mahanoy*, the Supreme Court clarified that special characteristics that give schools additional license to regulate student speech do not always disappear when that speech takes place off campus. Circumstances that may implicate a school's regulatory interests include serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices. *Id.* at 2044-45. However, the Supreme Court explained, three features of off-campus speech often, even if not always, distinguish schools' efforts to regulate off-campus speech: First, a school will rarely stand *in loco parentis* when a student speaks off campus. Second, from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day. That means courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all. Third, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus, because America's public schools are the nurseries of democracy. Taken together, these three features of much off-campus speech mean that the

leeway the First Amendment grants to schools, considering their special characteristics, is diminished. *Id.* at 2045-47.

The Court decides this case on grounds of qualified immunity as to the individual Defendants and governmental immunity as to Katy ISD.

### a. *Qualified Immunity*

When a defendant asserts a qualified-immunity defense in a motion to dismiss, the court has an "obligation . . . to carefully scrutinize [the complaint] before subjecting public officials to the burdens of broad-reaching discovery." *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986); *see also Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) ("[I]mmunity means more than just immunity from liability; it means immunity from the burdens of defending a suit, including the burdens of pretrial discovery."). A defendant is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "This is not to say that an official action is protected by qualified immunity unless the very act in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 618 (5th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). If, at the time of the events underlying the litigation, "insufficient precedent existed to provide school officials with 'fair warning' that the defendants' conduct violated the First Amendment," the defendants are entitled to qualified immunity. *Jackson v. Ladner*, 626 F. App'x 80, 88 (5th Cir. 2015) (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).

In the traditional two-step approach to qualified immunity, a court first determines that the plaintiff's alleged facts stated a claim for the violation of a constitutional right, then analyzes whether the right at issue was clearly established at the time of the defendant's actions. *Longoria*, 942 F.3d at 264. This two-step inquiry, however, is not mandatory. *Id.* As the Supreme Court decided in *Pearson v. Callahan*, courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009). If the court determines that the right asserted by the plaintiff was not clearly established, it need not reach the more difficult constitutional question. *Camreta v. Greene*, 563 U.S. 692, 707 (2011); *see also City of Tahlequah, Oklahoma v. Bond*, ___ S.Ct. ___, 2021 WL 4822664 at *2 (2021) ("We need not, and do not, decide whether the officers violated the Fourth Amendment in the first place, or whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment. On this record, the officers plainly did not violate any clearly established law."); *Morgan v. Swanson*, 659 F.3d 359, 384 (5th Cir. 2011) ("Because we have granted immunity to the [defendants] at step two of the qualified-immunity analysis, it is within our discretion to decline entirely to address the constitutionality of the defendants' conduct."). Indeed, the Supreme Court has "detailed a range of circumstances in which courts should address only the immunity question," and has admonished courts to "think hard, and then think hard again, before turning small cases into large ones" by engaging in unnecessary constitutional analysis. *Camreta*, 563 U.S. at 707.

The Fifth Circuit recently addressed the issue of qualified immunity as to off-campus speech in *Longoria*. There, the plaintiff liked, reposted, and responded to Tweets apparently in violation of the Cheerleading Constitution she and her parent signed. There, the Fifth Circuit held that, "[b]ecause *Bell* . . . did not articulate a generalized rule that could have applied to [the

plaintiff] M.L.'s speech, it d[id] not constitute clearly-established binding law that should have placed the defendants on notice about the constitutionality of their actions." *Longoria*, 942 F.3d 258, 267. It highlighted two other cases to underscore that much of the law on the boundaries of off-campus speech remained unclear at the time that M.L. was dismissed from the cheerleading team. In *Porter v. Ascension Parish School Board*, 393 F.3d 608 (5th Cir. 2004), the Fifth Circuit granted qualified immunity to a school official after a student's sketch depicting a "violent siege" on his high school community was inadvertently brought to school by his younger brother. *Id.* at 611, 620. The Fifth Circuit noted that the contours of the First Amendment "as applied to off-campus student speech inadvertently brought on campus by others" was "unsettled." *Id.* at 620. Because of the uncertainty in the law and the lack of clear precedent that could have guided official conduct, it held that the school official's actions were reasonable. *Id.* at 621.

Since *Porter*, the Fifth Circuit's cases have "failed to clarify the law governing school officials' actions in disciplining off-campus speech." *Longoria*, 942 F.3d 258, 267. In *Jackson v. Ladner*, 626 F. App'x 80 (5th Cir. 2015), a case applying pre-*Bell* authority, the Fifth Circuit granted qualified immunity to a school official who suspended a cheerleader from the cheer squad based on messages she sent to another member of the team on Facebook. *Id.* at 81, 88–89. It noted that its cases "had sent 'inconsistent signals' with regard to 'how far school authority to regulate student speech reaches beyond the confines of the campus,'" and therefore failed to provide school officials with "fair warning" about the boundaries of on-campus speech. *Id.* at 88–89 (quoting *Porter*, 393 F.3d at 620).

The Fifth Circuit similarly concluded that the Supreme Court's cases had not clearly established the constitutionality of the defendants' actions because the Supreme Court "ha[d] not had the occasion to articulate a rule that sets forth the limits of school discipline of off-campus

speech." *Longoria*, 942 F.3d 258, 267. Its most recent case on the matter, *Mahanoy*, has still

fallen short of doing so. *Mahanoy* delineated three features of much off-campus speech that

mean "that the leeway the First Amendment grants to schools in light of their special

characteristics is diminished." *Mahanoy*, 141 S. Ct. 2038, 2046 (2021). But the Supreme Court

explicitly "le[ft] for future cases to decide where, when, and how these features mean the

speaker's off-campus location will make the critical difference." *Id.* The Supreme Court listed

circumstances that "may implicate a school's regulatory interests," *id.* at 2040 (emphasis added)

but declined to provide any definitive criteria. And in any event, *Mahanoy* was decided on June

23, 2021, after the events that precipitated this lawsuit.

Though courts "do[] not require a case directly on point" to defeat a qualified-immunity

defense, a school official is entitled to immunity from suit unless "existing precedent . . . placed

the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011) (emphasis added); *see also Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019)

("[C]learly established law comes from holdings, not dicta."). Here, there was no general rule

that could have placed Defendants on notice that it would be unconstitutional to discipline Mr.

McClelland for his off-campus speech, which included a threat of physical violence against

another student.[4] Thus, the Court finds as a matter of law that Mr. McClelland's free speech

rights were not clearly established when he was disciplined for the Snapchat video.

---

[4] Plaintiff argues that Defendants did not genuinely intend to physically harm the recipient. Even if this were true, it is still not "clearly established" that disciplining a student for a "taunt" or threat of violence apparently stated in jest is unconstitutional. In fact, other courts applying *Tinker* have dismissed First Amendment claims at the pleadings stage even where the student's speech was allegedly meant as a joke. For example, in *C1.G. v. Siegfried*, a student was expelled for posting (off campus) a Snapchat picture of him and his friends wearing hats and wigs, with the caption "Me and the boys bout to exterminate the Jews." 477 F. Supp. 3d 1194, 1200 (D. Colo 2020). The *Siegfried* court dismissed the student's First Amendment claim on a motion to dismiss, finding that whether the student meant the post as a joke and whether he intended to threaten anyone were not material to the analysis. *See id.* at 1209. In *A.S. v. Lincoln County R-III School District*, the court granted judgment on the pleadings under Rule 12(c). 429 F. Supp. 3d 659 (E.D. Mo. 2019). In that case, the plaintiff posted a doctored picture to Snapchat, making it appear that another student had died and was in a casket, and suggested that a visitation would be held at a local funeral home.

Without needing to decide the closer question whether Mr. McClelland sufficiently stated a First Amendment claim, the Court concludes that the individual defendants are entitled to qualified immunity.

### b.   § 1983

Section 1983 does not make municipalities vicariously liable for the wrongdoing of their employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, to hold a municipality liable for a constitutional violation under § 1983, a plaintiff must show that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)). "[T]he identification of policymaking officials is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988).

Under Texas law, the final policymaker for a Texas independent school district is its board of trustees. *See Longoria*, 942 F.3d 258 at 271; *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993); TEX. EDUC. CODE §§ 11.151(b) ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district."). Because the "specific identity of the policymaker is a legal question that need not be pled," plaintiffs can state a claim for municipal liability if they plead sufficient facts to allow the court to reasonably infer that the Board either adopted a policy that caused injury or delegated to a subordinate officer the authority to adopt such a policy. *Groden v. City of Dallas*, 826 F.3d 280, 284, 286 (5th Cir. 2016). In short, plaintiffs must plead facts that sufficiently

---

*Id.* at 664. Because it found that the *Tinker* standard is an objective one, the court held that "A.S.'s after-the-fact characterization that the meme was meant to be a joke is therefore irrelevant." *Id.* at 670.

connect the policymaker—here, the Board of Trustees—to the allegedly unconstitutional policy. *Id.*

Here, Plaintiff pleads no facts suggesting that its Board of Trustees had any involvement in the incidents underlying this lawsuit. He has not alleged any facts suggesting that the Board of Trustees formally adopted any policies, regulations, bylaws, or ordinances responsible for the alleged violation of his First Amendment rights.

Nor has Plaintiff pled sufficient facts to allow the court to infer that the Board of Trustees delegated policymaking authority to Defendants. "A municipality can be held liable only when it delegates policymaking authority, not when it delegates *decisionmaking* authority." *Longoria*, 943 F.3d at 271 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *Jett*, 7 F.3d at 1246–47). The "finality of an official's action does not . . . automatically lend it the character of a policy," *Bolton v. City of Dallas*, 541 F.3d 545, 550 (5th Cir. 2008); *see also Jett*, 7 F.3d at 1246. The Supreme Court's cases "sharply distinguish[ ] between decisionmakers and final policymakers." *Jett*, 7 F.3d at 1247. In this case, Plaintiff points out that Katy ISD issued a statement that "[t]he student responsible will face disciplinary consequences in accordance with the Katy ISD Discipline Management Student Code of Conduct and Athletic Code of Conduct." Doc. 82, at 3. However, allegations that Defendants disciplined Plaintiff *in accordance with* policies directly or indirectly adopted by the Board of Trustees still fail to meet the requirement that Defendants themselves exercise policymaking authority.

Finally, Plaintiff has not alleged that the Board permitted "persistent and widespread practices" or "practices that are permanent and well settled and deeply embedded traditional ways of carrying out policy." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984). In

fact, the Second Amended Complaint does not mention Katy ISD's Board of Trustees whatsoever, *see generally* Doc. 37.

Additionally, to the extent that the Second Amended Complaint alleged "failure to train" as a method for proving entity liability for a constitutional violation, *see*, *e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006), Plaintiff explicitly waived the claim. Plaintiff's Supplemental Reply Regarding Qualified Immunity, Doc. 82, at 1 ("At oral argument, Plaintiff . . . conceded he was waiving . . . a "failure to train" claim (which he never pled).").

Based on the above, Plaintiff has failed to state a *Monell* claim. The Court need not address the third prong—whether an official policy promulgated by a policymaker was the "moving force" behind a constitutional violation. Because Plaintiff has not stated a claim for either individual or municipal liability, the First Amendment claim as to Plaintiff's off-campus speech is DISMISSED WITH PREJUDICE.

### 2. Due Process & First Amendment—Athletic Code of Conduct

Plaintiff alleges that Katy ISD's Athletic Code of conduct is unconstitutionally vague and overbroad on its face.

#### a. Vagueness

Mr. McClelland alleges that the Katy ISD's Athletic Code of Conduct, on its face, is unconstitutionally vague in violation of the First Amendment. Plaintiff specifically raises issue with its requirements that athletes "display/model behaviors associated with positive leaders both in the school and in the community," "exhibit good citizenship at all times," and "conduct themselves as gentlemen and ladies at all times, demonstrating respect for their administrators, teachers, and fellow students." *See* Doc. 37-1, at 43.

"A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 224-25 (5th Cir. 2009). The standard is heightened in the school context. "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986).

Most importantly here, a void for vagueness challenge is, ultimately, a due process claim. *Cash*, 585 F.3d at 225. To state a void-for-vagueness claim, a plaintiff must allege that he was deprived of a property or liberty right. *See City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). The vagueness doctrine may be invoked in the school context only where students have "faced a potential deprivation of their *property* interests in attending a public school." *Chalifoux v. New Caney Ind. Sch. Dist.*, c, 668 (S.D. Tex. 1997) (emphasis added). The Fifth Circuit has held that "[a] student's interest in participating in a single year of interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement." *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980).

In this case, Plaintiff alleges that the discipline imposed on him for the off-campus speech was suspension from two games and stripping of his title as team captain. Neither participation in football nor team captainship constitutes a property or liberty right of which Plaintiff was deprived. Thus, his vagueness claim must fail.

### b. Overbreadth

Plaintiff's overbreadth claim is also unavailing. The overbreadth doctrine provides that "a broadly-written statute may have such a deterrent effect on free expression that it should be subject to a facial challenge even by a party whose own conduct may be unprotected." *Int'l Soc. for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 500 (5th Cir. 1989). "A regulation is constitutionally overbroad if it (1) prohibits a substantial amount of constitutionally-protected freedoms, when judged in relation to the regulation's 'plainly legitimate sweep' . . . and (2) is not susceptible to a limiting construction that avoids constitutional problems." *Chalifoux*, 976 F. Supp. at 670 (citations omitted).

But critically, "[t]he overbreadth doctrine enables a plaintiff to challenge a statute where it infringes on *third parties* who are not parties to the action." *Id.* (emphasis in original). Courts "generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449 n.6 (2008). In this context, "an overbreadth challenge is not appropriate if the first amendment rights asserted by a party attacking a statute are essentially coterminous with the expressive rights of third parties." *United States v. Petras*, 879 F.3d 155, 167 (5th Cir. 2018) (citation omitted); *see Chalifoux*, 976 F. Supp. at 760 (citing *U.S. v. Hicks*, 980 F.2d 963, 969 (5th Cir.1992)) (rejecting overbreadth claim against school policy where students also raised substantive challenge as applied to their own First Amendment rights).

The First Amendment rights asserted by Plaintiff in this case are "essentially coterminous" with the expressive rights of third parties. Mr. McClelland has not alleged that the rights of third parties would be threatened in a manner different from the alleged threat to his

rights. His Response only contains a general statement of the law on overbreadth challenges, untethered to well-pleaded facts that could survive a Rule 12(b)(6) motion. *See*, *e.g.*, *Longoria as next friend of M.L. v. San Benito Consol. Indep. Sch. Dist.*, No. 1:17-CV-160, 2018 WL 6288142, at *18 (S.D. Tex. July 31, 2018), *report and recommendation adopted*, No. 1:17-CV-00160, 2018 WL 5629941 (S.D. Tex. Oct. 31, 2018), *aff'd sub nom. Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258 (5th Cir. 2019) (dismissing overbreadth claim upon Rule 12(b)(6) motion). Therefore, the overbreadth claim, like the vagueness claim, is DISMISSED WITH PREJUDICE.

### 3. Due Process (Procedural and Substantive)

Plaintiff alleges that the District, Superintendent Gregorski, Principal Hull, and Justin Graham (Katy ISD's General Counsel) violated his due process rights by disciplining him for possessing marijuana on school property. He further contends that Defendants violated his substantive due process rights by reinstating his discipline for possessing marijuana on school property, since Superintendent Gregorski had allegedly overturned his discipline and made a final determination that Plaintiff did not intend to possess the substance on campus.

Under the Fourteenth Amendment, state actors may not deprive "any person of life, liberty, or property without due process of law." U.S. CONST. AMEND. XIV. "The first inquiry in every due process challenge—whether procedural or substantive—is whether the plaintiff has been deprived of a protected interest in property or liberty." *Edionwe v. Bailey*, 860 F.3d 287, 292 (5th Cir. 2017). Further, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Here, Plaintiff alleges that Defendants deprived him of a protected interest by placing him in a DAEP, which damaged his reputation and scholastic record, and prevented him from participating in football at Katy ISD. However, in *Nevares v. San Marcos Consolidated Independent School District*, the Fifth Circuit held that students do not have a protected right to a specific curriculum or to placement at a particular school; accordingly, an assignment to an alternative education program does not deprive a student of any protected property rights or liberty interests. 111 F.3d 25, 26-27 (5th Cir. 1997); *see also Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir.2011) ("A student's transfer to an alternate education program does not deny access to public education and therefore does not violate a Fourteenth Amendment interest."); *C.C. v. Hurst-Euless-Bedford Indep. Sch. Dist.*, No. 4:14-CV-646-A, 2015 WL 136379, at *3 (N.D. Tex. Jan. 8, 2015), *aff'd*, 641 F. App'x 423 (5th Cir. 2016).[5] Similarly, students "do not possess a constitutionally protected interest in their participation in extracurricular activities." *Doe v. Silsbee Ind. Sch. Dist.*, 402 Fed. Appx. 852, 854 (5th Cir. 2010) (quoting *NCAA v. Yeo*, 171 S.W.3d 863, 865 (Tex. 2005)). The Fifth Circuit has rejected attempts to classify extracurricular activities as protected interests implicating the safeguards of due process. *Walsh*, 616 F.2d at 159; *Niles v. Univ. Interscholastic League*, 715 F.2d 1027, 1031 (5th Cir. 1983); *see also Khan v. Fort Bend Indep. Sch. Dist.*, 561 F. Supp. 2d 760, 764-65 (S.D. Tex. 2008).

---

[5] Following *Nevares*, numerous Texas courts have held that a DAEP referral does not deprive a student of due course of law under Article I, Sec. 19 of the Texas Constitution. *See*, *e.g.*, *Stafford Mun. Sch. Dist. v. L.P.*, 64 S.W.3d 559, 562-63 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Northwest Indep. Sch. Dist. v. K.R.*, 2020 WL 4907331, *4-5 (Tex. App.—Fort Worth 2020, no pet.) ("[D]istrict and appellate courts have no jurisdiction to review the decision to place a student in DAEP."); *Stephens v. Trinity ISD*, 2012 WL 5289346, *3-4 (Tex. App.—Tyler 2012, no pet.) ("[T]he alleged damage is to the student's reputation and the harm that flows from unsubstantiated DAEP placement, particularly, harm to the student's standing with fellow pupils and teachers, as well as interference with opportunities for higher education and employment . . . [D]amage to the reputation of the student alone is not enough to establish a due process violation.").

The facts Plaintiff alleges as to the marijuana-related disciplinary proceedings initiated against him, if accepted as true, raise substantial concerns. Those concerns, however, are not for the courts to address. As a matter of law, the Court concludes that Plaintiff cannot state a claim for a violation of due process, whether procedural or substantive, because he was not deprived of any protected property rights or liberty interests. Plaintiff's due process claims are DISMISSED WITH PREJUDICE.

### 4. *State Claims*

Because the Court dismisses Plaintiff's federal claims, no federal question remains before the district court. But this fact does not divest the court of jurisdiction; instead, the court must exercise its discretion whether to exercise supplemental jurisdiction over Mr. McClelland's state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection(a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction"). When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. *Bass v. Parkwood Hosp.* 180 F.3d 234, 246 (5th Cir. 1999) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)). However, the dismissal of the pendent claims should expressly be *without* prejudice so that the plaintiff may refile his claims in the appropriate state court. *Bass*, 180 F.3d at 246. Therefore, Plaintiff's state claims here are DISMISSED WITHOUT PREJUDICE.

## III.    MOTION TO STRIKE MOTIONS TO QUASH DEPOSITION NOTICES

Because the Court dismisses all claims, it need not rule on the Motion to Strike and Motions to Quash Deposition Notices. These motions are DENIED AS MOOT.

IV.     **MOTION TO UNSEAL**

Plaintiff moved to unseal the Motions to Quash that Defendants filed under seal. At the oral hearing, Defendants argued that individuals Defendants and witnesses have been or are likely to be subject to public harassment related to this case. While the public has an interest in accessing court documents, those interests are outweighed in this case by the privacy and safety interests of the individuals at issue. Therefore, Plaintiff's Motion to Unseal is DENIED.

V.      **CONCLUSION**

The Court is not insensitive to Plaintiff's circumstances. His educational career and his hopes for a future in college athletics suffered significant injury, largely due to a moment's worth of juvenile and shameful misconduct. Nevertheless, sympathy for a young man's plight does not license any court to countermand well-established law or to offload ultimate responsibility from the individual to educational authorities.

*       *       *

The Court **GRANTS** the Motion to Dismiss as follows: Plaintiff's First Amendment and Due Process claims are **DISMISSED WITH PREJUDICE**, and his claims under state law are **DISMISSED WITHOUT PREJUDICE**.

The Motion to Strike and Motions to Quash are **DENIED AS MOOT**.

Lastly, the Motion to Unseal is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on November 1, 2021.

Keith P. Ellison
United States District Judge

27 / 27